UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 1:22-cr-20104-JEM-1

UNITED STATES OF AMERICA

v.

ARCANGEL PRETEL ORTIZ,

    Defendant.
_____ /

**DETENTION ORDER**

Pursuant to 18 U.S.C. § 3142(f), the Court held a hearing on February 17, 2023, to determine whether to detain Defendant Arcangel Pretel Ortiz ("Ortiz") before and until the conclusion of trial. The United States of America (the "Government") moved for pretrial detention under 18 U.S.C. § 3142(e)(3)(B), arguing that Defendant poses a risk of flight and a danger to the community. Having considered the factors enumerated in 18 U.S.C. § 3142(g), the Court finds that no condition or combination of conditions of release will reasonably assure the Defendant's appearance as required or the safety of the community if Defendant is released. As such, the Court **ORDERS** that Defendant Arcangel Pretel Ortiz be detained before and until the conclusion of trial.

    **I.**    **INTRODUCTION**

Defendant is charged by indictment in the Southern District of Florida with one count of conspiracy to kill and kidnap a person outside of the United States, in violation of 18 U.S.C. § 956(a)(1); one count of conspiracy to provide material support and resources to carry out a violation of Section 956(a)(1) resulting in death, in violation of 18 U.S.C. § 2339A(a); and one count of providing material support and resources to carry out a violation resulting in death, in

violation of 18 U.S.C. § 2339A(a).  The Government seeks detention on the bases of risk of flight and danger to the community.  On February 17, 2023, I held a hearing to determine whether any condition or combination of conditions will reasonably assure the appearance of Defendant as required and the safety of any person and the community.  18 U.S.C. § 3142(f).  The Government must establish by a preponderance of the evidence that no condition or combination of conditions will reasonably assure Defendant's appearance as required.  *United States v. Medina*, 775 F.2d 1398, 1402 (11th Cir. 1985).  The Government must establish by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of any individual or the safety of the community.  18 U.S.C. § 3142(f)(2).  Because I find, based on the below, that there is probable cause to believe Defendant has committed the alleged offenses, a rebuttable presumption applies in this case that no condition or combination of conditions of release will reasonably assure the appearance of Defendant as required and the safety of the community.  18 U.S.C. § 3142(e)(3)(B).  Assuming, *arguendo*, that a defendant comes forward with sufficient evidence to rebut the statutory presumption, the presumption "remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence." *United States v. Quartermaine*, 913 F.2d 910, 916 (11th Cir. 1990); *United States v. King*, 849 F.2d 485, 488 (11th Cir. 1988).  Throughout this proceeding, the burden of persuasion is upon the Government to establish by clear and convincing evidence that the defendant poses a danger to the community, 18 U.S.C. § 3142(f), and/or to establish by a preponderance of the evidence that he poses a risk of flight.  *Quartermaine*, 913 F.2d at 917.  In determining whether the Government has met its burden by the requisite standard of proof, this Court must take into account the factors enumerated in 18 U.S.C. § 3142(g).  Title 18, United States Code, Section 3142(g) requires the Court to consider the nature and circumstances of the offense, the weight of the evidence against Defendant, the history

and characteristics of Defendant, and the nature and seriousness of any danger to a person or to the community caused by Defendant's release.

## II. FINDINGS OF FACT

The evidence adduced at the pretrial detention hearing consisted of the information contained in the Pretrial Services Report, the Criminal Complaint (ECF No. 1), and the testimony of Federal Bureau of Investigation ("FBI") Special Agent Michael Ferlazzo. I considered all of this evidence in making my findings. Pursuant to 18 U.S.C. § 3142(i), the Court makes the below factual findings and statement of the reasons for the detention.[1]

### a. Evidence of the Alleged Offenses

The Government proffered the following facts, at the hearing on February 17, 2023 and in the Complaint. The Court also heard testimony from FBI Special Agent Michael Ferlazzo. Special Agent Ferlazzo adopted the Government's following proffer as his own and confirmed its accuracy.

On July 7, 2021, the President of Haiti, Jovenel Moise ("President Moise"), was assassinated in his residence in Port-au-Prince, Haiti. That morning armed assailants entered the President's residence and shot him twelve times. The First Lady of Haiti survived but suffered multiple gunshot wounds.

The Government proffered the President's assassination was the culmination of months of planning. Based on witness interviews and the review of documents and seized electronic evidence, the Government proffered that, beginning in or around February 2021, Ortiz and Antonio Intriago ("Intriago"), as principals of related South Florida-based companies Counter Terrorist

---

[1] These findings are solely for purposes of deciding whether the Government has met its burden of proving that the Defendant should be detained. They should not be construed in any way as modifying or limiting the presumption of the Defendant's innocence. *See* 18 U.S.C. § 3142(j).

Unit Federal Academy and Counter Terrorist Unit Security (collectively "CTU"), entered into discussions with Christian Emmanuel Sanon ("Sanon"), who opposed President Moise's administration and was interested in becoming President of Haiti.  CTU agreed to support Sanon in his efforts.  At the end of April 2021, another South Florida company, Worldwide Capital Lending Group ("Worldwide"), and its principal Walter Veintemilla ("Veintemilla"), agreed to finance CTU's support of Sanon.  On April 30, 2021, Worldwide provided CTU with a $175,000.00 line of credit, which was executed by Intriago and Veintemilla, with Ortiz signing as a witness.

The Government proffered that, in the beginning of April 2021, several of the conspirators (including Ortiz and Veintemilla) met in the Southern District of Florida to discuss how to forcibly remove and kidnap President Moise and install Sanon as President of Haiti.  At various meetings in early April 2021, the conspirators discussed acquiring weapons and military equipment to facilitate their plan to remove President Moise and replace him with Sanon.

The Government proffered that, with Sanon as president, Ortiz and Intriago through CTU, and Veintemilla through Worldwide, expected to reap financial benefits should Sanon secure the presidency, largely by being awarded contracts for infrastructure projects in Haiti, the provision of security forces, and the provision of military-type equipment to a Sanon-led Haitian government.  The Government further proffered that, beginning in or around April 2021 and continuing through early June 2021, Ortiz and Intriago, as principals of CTU, retained a group of approximately 20 Colombian nationals with military training (including German Alejandro Rivera-Garcia ("Rivera") and Mario Antonio Palacios Palacios ("Palacios")) allegedly to provide security for Sanon.  CTU, Worldwide, and others began expending funds with the expectation that Sanon would be able to replace President Moise, at which time CTU claimed that it would contract,

fly in, and outfit hundreds of additional Colombian nationals to protect Sanon and train Haitian law enforcement.

The Government proffered that, operating primarily from the Southern District of Florida, Ortiz and Intriago managed and directed other members of the conspiracy, including James Solages ("Solages") (who coordinated with Joseph Vincent ("Vincent") and Sanon) and the Colombian nationals (through Rivera and/or another Colombian leader in Haiti). On March 15, 2021, CTU entered into an agreement with Solages, giving him "exclusive authorization" as CTU's "authorized representative" in Haiti. This agreement was signed by Intriago and Solages. Ortiz and Intriago also enlisted the help of Joseph Joel John ("John"), a former Haitian senator. Other Haitian citizens, including Rodolphe Jaar ("Jaar"), later joined the operation with the shared goal of ousting President Moise.

In the course of the alleged conspiracy, Ortiz, Intriago, and Veintemilla exchanged a number of written and audio communications in their planning. The Government proffered these messages show Ortiz directing the members of the conspiracy. The Government proffered that Solages would refer to Ortiz as "colonel" and take directives from Ortiz. On April 20, 2021, Ortiz told Solages that the "current President [of Haiti] is the thief . . . delete the messages that could compromise you in case of being captured." On April 21, 2021, Solages sent Ortiz a list of military equipment needed for the operation, which included, among other things: "M-4" rifles, "M-60" machineguns, "Kalashnikov" rifles, "combat boots," "hand grenades," "gas mask," "full bulletproof vests," 6 "RPG" (rocket-propelled grenades), and over 20,000 rounds of ammunition. On April 23, 2021, Ortiz told Solages to see "with your own eyes" the security at both the Haitian Presidential Palace (the "Palace") and President Moise's residence.

On April 27, 2021, Ortiz sent a text message to Rivera with a photo of a whiteboard with a drawing of the Palace. The Government proffered the drawing depicted an assault plan of the Palace. Special Agent Ferlazzo testified the whiteboard appears to describe the use of "snipers" and references a "milicia [sic] team" that comprises "10 warriors – neutralizers" and shows "palace security."[2] Rivera responded that they would need to contemplate reserve and arrival time, principal route, and alternative communication. Ortiz sent the same photo to Veintemilla on May 6, 2021.

On May 22, 2021, Ortiz sent Solages the following text message: "If things do not go well in the next few days, things could come against us. You are still an American citizen and for conspiracy you can get 25 years in prison, you have to be very careful with everything you say, especially in a group, and I know you were very uncomfortable with everything I was saying, losing control."

On June 2, 2021, Solages texted Intriago a photograph of himself, John, Vincent, and other co-conspirators sitting around a table with the message "conducting the hitting plans right now."

On June 3, 2021, Veintemilla messaged Frederick Bergmann ("Bergmann") that he "just wired 15k to [Solages] for screws." The same day, Intriago texted Solages that "15k on the way" and "please make it happens [sic]." Solages responded "getting the screws as we speak." Intriago responded, "Ok hope you got enough screws But remember the 20 workers don't work without tools," and then asked what type of tools Solages had, noting that it "must be the complete set short drills and long ones." Solages texted that "the screws cases 556 cost $3500." Special Agent Ferlazzo testified that "screws" and "nails" were words used as coded references by the conspirators for ammunition, "tools" or "instruments" were words used as coded references for

---

[2] The photo of the whiteboard was offered into evidence as Government's Exhibit 1.

firearms, and "workers" was used as coded reference for the Colombian nationals. Special Agent Ferlazzo testified the communications indicate that Veintemilla had provided $15,000.00 to Solages to purchase ammunition, which Intriago confirmed with Solages and then reminded Solages that the Colombian nationals ("workers") would not be able to do their jobs without weapons ("tools") and that Solages needed to obtain a variety of firearms ("short drills and long ones") for the operation.

On June 7, 2021, Veintemilla sent Ortiz a document titled "Loan Provided to Christian Sanon" that provided $15,000.00 to "[Solages] for screws and nails," and $250,000.00 for "100 Complete vest." Special Agent Ferlazzo testified that CTU had access to a large number of armored vests and planned to use those vests to outfit the Colombian nationals and others, for the benefit of Sanon. Special Agent Ferlazzo testified he understood these communications to indicate that Veintemilla intended to loan Sanon funds to both support the purchase of ammunition ("screws and nails") and for armored vests ("100 Complete vest").

The Government proffered that, in text messages sent on June 7, 2021, Veintemilla stated that if Ortiz does not give the order, people will always use the excuse that someone is not ready, and those who are ready should go out and demonstrate on the street as that it is the only way to attract the news stations and make the president nervous enough to leave. Special Agent Ferlazzo testified these messages demonstrate Veintemilla was advising Ortiz that Ortiz must order the operation to remove President Moise to go forward and that people needed to engage in a public protest against Moise's presidency to assist in President Moise's removal. The Government proffered these messages demonstrate an impatience in executing President Moise's removal.

On June 8, 2021, Ortiz sent Solages an audio message stating, "we are in red numbers and we need go [sic] forward." The next day, Ortiz sent another audio message to Solages, in which

Veintemilla also spoke. Veintemilla told Solages "the plan has to be simultaneously . . . . it can't just be hit the rat, that's not how that's going to work 'cause then we are going to look horrible." Special Agent Ferlazzo testified he understood the word "rat" to be a reference to President Moise. Special Agent Ferlazzo also testified that the messages reflect Ortiz's concern that the delay in replacing President Moise had resulted in CTU not recouping its expenses, which is what Ortiz meant by "we are in red numbers," and that the operation needed to go forward. Special Agent Ferlazzo testified that he understood Veintemilla stating "the plan has to be simultaneously . . . . it can't just be hit the rat" to mean that the public demonstrations and the "hit" on the President needed to occur at the same time, because if President Moise was forcibly removed or murdered without the appearance of public support, the conspirators would suffer reputational damage. The Government proffered that Solages responded he understood the foregoing.

On June 9, 2021, Veintemilla sent a text message to Bergmann and separately to Solages stating:

> Fred it is very important that you and everyone there understand that we have lost the element of surprise. Every day Mr. P and everyone there run the risk of having 200 or 300 personal of the rat going there and arresting everyone. If this happened then what are you going to do. From what we are told mr. P has meetings with many people. And any one of these people can inform the rat. This is very dangerous for this reason is that we are pressuring for things to happen. Later we do not want for you guys to tell us why didn't you factor this in and let us know. So please understand the party has to happen or the personal is coming back because they do not want to get caught in this situation.

Special Agent Ferlazzo testified that he understood the term "party" to refer to the operation, and that the conspirators referred to Sanon as "Mr. President" and, thus, the references to "Mr. P" are references to Sanon. As such, Special Agent Ferlazzo testified the above text message was Veintemilla warning Bergmann that the operation to replace President Moise had likely leaked, as Sanon had held a number of meetings relating to his presidential aspirations and

8

therefore the conspirators were risking arrest by President Moise's personnel. Agent Ferlazzo testified Veintemilla was further urging Bergmann in this text message to help move the operation forward quickly because otherwise it was "very dangerous" for those involved if they were to "get caught."

On June 10, 2021, Solages asked Intriago in a text message for 150–200 zip-tied handcuffs, and Intriago replied with a photograph of the zip-tied handcuffs and said, "No ankle." Special Agent Ferlazzo testified that he understood this exchange as Solages sending Intriago a photograph of the restraints the conspirators intended to use during the operation, and Intriago sending back a photograph indicating the conspirators had wrist restraints, but that they were lacking ankle restraints.

On June 15, 2021, Rivera sent Ortiz a text message stating that the Colombian nationals needed a battering ram to breach doors, as well as black caps, cash, balaclavas, gun holsters, and other materials.

The Government proffered that, around mid-June of 2021, Ortiz, Intriago, and Veintemilla realized that Sanon had neither the constitutional qualifications nor the popular support of the Haitian people to become President of Haiti. On June 11, 2021, Ortiz messaged Solages that "if Sanon is American / Haitian he cannot be a Minister and because he does not reside for 5 years, he cannot be President or Prime Minister."

The Government proffered the conspirators shifted their support to a former Haitian Supreme Court judge ("Individual-2"). The Government further proffered that CTU and Worldwide took steps to ensure that their financial interests would be protected if they assisted Individual-2 in obtaining the Haitian Presidency. CTU and Worldwide signed "consultation agreements" with Individual-2 in which Individual-2 promised them future business contracts. On

9

June 14, 2021, Veintemilla and Ortiz texted each other about getting these agreements with Individual-2 notarized. Special Agent Ferlazzo testified that Veintemilla sent a message to Ortiz stating, in substance, that these agreements could not be notarized until Individual-2 was in power. Ortiz responded with the suggestion that they send the documents to Solages so they could plan ahead. Agent Ferlazzo testified that he understood this exchange to mean Veintemilla and Ortiz discussed Individual-2's signing of the new consultation agreements with CTU and Worldwide, and they needed to wait until Individual-2 was sworn in as President before notarizing the agreements.

On June 20, 2021, Solages texted Ortiz that they needed "10 DEA Velcro patches, Front & Back and 26 mask full face cover" to arrive by June 22, to which Ortiz responded, "costume party." The Government proffered that Haitian law enforcement recovered DEA patches from the crime scene after President Moise's assassination, and that witnesses identified Solages as the person who falsely identified the assassins as "DEA" as the assassins approached the President's residence.

The Government proffered that, on June 28, 2021, Solages flew from Haiti to the Southern District of Florida to deliver a purported Haitian immunity agreement to Ortiz, Intriago, and Veintemilla. The document was dated and executed on June 22, 2021 by Individual-2, claimed President Moise "illegally and unconstitutionally extended his presidential mandate," and requested CTU for its "urgent HELP and assistance," promising "immunity, protection, and security to their actions in our favor." This occurred weeks before President Moise's assassination.

The Government proffered that on June 30, 2021, Ortiz texted a copy of the signed immunity document to Intriago, Veintemilla, Solages, Rivera, and another co-conspirator. According to messages sent among the conspirators regarding the purported Haitian immunity

agreement, the conspirators believed that this document would protect them from prosecution in Haiti once Individual-2 was sworn in as President.

The Government proffered that, by July 6, 2021, over 20 individuals from Colombia had traveled to Haiti to participate in the operation to remove President Moise by kidnapping or killing him. The Government proffered their travel was arranged for and funded by Veintemilla.

The Government proffered that on July 6, 2021, Ortiz and Intriago, in a series of text messages asked Veintemilla to pay the Colombians. Veintemilla responded that things took too long and that there was no money or investors and that until Individual-2 was sworn in and President Moise was out of office, the investors would not contribute any more money. Veintemilla stated that they must accept that the operation had failed. Ortiz responded that he did not have permission to fail and that by the end of the following day, Veintemilla would see things better. The Government further proffered that Ortiz told Veintemilla to calm down, as things were just getting started.

The Government proffered that on July 6, 2021 several conspirators, including Solages, Vincent, Rivera, John, Jaar, and Palacios, met prior to the assassination at the home of a family member of Jaar's, located near the President's residence in Haiti. At that meeting, firearms and equipment were distributed, and Solages falsely announced to the group that it was a "CIA Operation," and thereafter further explained that he meant the mission would involve killing President Moise.

The Government proffered that on July 7, 2021, several conspirators drove a convoy to President Moise's residence with Solages, Rivera, and Vincent traveling together in one of the vehicles. Once the group of conspirators arrived outside the President's residence, Solages falsely announced to those inside the residence that they were engaged in a "DEA Operation" in an attempt

to ensure compliance by the President's security and other civilians. The Government proffered that a subset of Colombian conspirators, including Palacios, was assigned to find the President and assassinate him.

Ortiz, Intriago, Veintemilla, and Bergmann were interviewed after the assassination. The Government proffered that Ortiz denied his involvement.

### b. Defendant's Background

The Pretrial Services Report states Defendant, who is 50, was born in Cali, Colombia. Ortiz is in the United States on a nonimmigrant visa; and is currently in the process of obtaining permanent residency. Ortiz possesses a valid Colombian passport, which is currently with the arresting agents. In the last ten years, Ortiz reported foreign travel to Spain, Peru, Ecuador, Brazil, and Bolivia.

Ortiz advised he has a college degree in journalism, which he obtained in 1998 or 1999 and was enlisted in the Colombian military service from 1992 to 1996, whereafter he retired from active duty.

According to the Pretrial Services Report, Ortiz has been employed as a driver/supervisor at SEM Tours for five years and his estimated monthly income is $3,800. Ortiz further advised he was self-employed at CTU Federal Academy, which he co-owned with a partner, from 2020 to July or August 2021. Ortiz indicated he provided security training and his partner handled the sale of security equipment. According to Ortiz, he owned 30–40% of the company; however, he separated from the company in July or August 2021 and has not been involved since.

Ortiz advised that he and his wife, who is a permanent resident of the United States, have been in a relationship for four years and married in 2022. They have no children together and he indicated he has never fathered any children.

Ortiz has been residing with his wife at their residence for a year and a half. Ortiz advised he rents a room for $1,050 monthly and has three roommates. If released on bond, he stated his intention of returning to said residence. Ortiz has been a resident of South Florida since 2014. From December 2013 to 2014, Ortiz stated he resided in New Jersey and New York and prior to December 2013, he resided in Colombia.

Ortiz's father is deceased and his mother resides in Madrid, Spain with Ortiz's brother. However, Ortiz indicated his mother is currently in Cali, Colombia. Ortiz has one brother who resides in Madrid, Spain with Ortiz's mother, and one paternal brother who resides in Cali, Colombia. Ortiz related having a good relationship with his mother and brother who reside in Spain and no relationship with his paternal brother residing in Colombia.

Ortiz has no prior criminal history.

### III.     STATEMENT OF REASONS FOR DETENTION

Under 18 U.S.C. § 3142(g), the Court must consider the nature and circumstances of the offense, the weight of the evidence against the Defendant, the history and characteristics of the Defendant, and the nature and seriousness of any danger to a person or to the community caused by the Defendant's release.

Considering those factors in detail as described below, and based upon the above findings of fact, the Court specifically finds: (1) by a preponderance of the evidence that no condition or combination of conditions of release will reasonably assure the Defendant's appearance as required; and (2) by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of the community.

### a. The Nature and Circumstances of the Offenses Charged

The nature and circumstances of the offenses charged are exceptionally serious; they indicate a significant probability of danger, especially given the nature of the crime alleged (assassinating a sitting president), the complexity of the conspiracy, and Ortiz's managerial role in that conspiracy.

The offenses involve providing material support and resources to effectuate death and killing a person outside the United States that indeed resulted in the death of President Moise. The conspirators' intention to use violence was evidenced by their purchasing "screws" and "nails," meaning ammunition, in preparation of effectuating their plan. An intention to use violence was also demonstrated when Solages sent Ortiz a list of military equipment needed, including items such as rifles, machine guns, hand grenades, rocket-propelled grenades, and bulletproof vests. Ortiz demonstrated an understanding of said violence when he sent out a picture of a whiteboard demonstrating the plan of where to position the "snipers," "milicia [sic]," and "warriors" around the President's Palace. Additionally, CTU, with Ortiz as a principal, sent 20 Colombian nationals with military training to Haiti to effectuate their plan, under the guise of security for Sanon. The nature of the offenses shows a reckless disregard for human life in the level of violence the conspirators, including Ortiz, were willing to undertake to assassinate President Moise.

The complexity of the plans that Ortiz and his co-conspirators formulated further speak to Ortiz's dangerousness. The conspirators held meetings over many months. The Government has proffered the conspirators raised $175,000.00 as an initial line of credit, $15,000.00 for "screws," and $250,000.00 for vests. The conspirators involved individuals in Florida, nationals from Colombia, and those on the ground in Haiti to scope out how to effectuate the assassination. This demonstrates a strong conviction and determination to assassinate President Moise.

The Government proffered that Ortiz, Intriago, and Veintemilla agreed to commit these offenses to obtain favorable contracts with a new Haitian president, such as sizeable infrastructure projects in Haiti, the provision of security forces, and the provision of military-type equipment to a Sanon-led Haitian government. To decide that another individual's life is worth less than one's own economic gain demonstrates a present danger to the community.

At the hearing on February 17, 2023, Defense counsel argued that Ortiz's role in the offenses mitigates the extent to which the charged offenses indicate Ortiz himself is currently a danger to the community. Counsel noted that Ortiz did not execute any of the plans in Haiti or commit any of the violent acts to accomplish the plan. However, the argument is undermined by the Government's proffer that Ortiz had a managerial role in the conspiracy, evidenced by the directives Ortiz provided to Solages, who was in Haiti and directly involved in assassinating President Moise, and Solages's references to Ortiz as colonel. Ortiz's managerial role in the conspiracy outweighs any mitigation from his lack of actual participation in the violence on the ground. Accordingly, the nature and circumstances of the offenses charged weigh in favor of detention.

**b. The Weight of the Evidence Against Defendant**

The weight of the evidence against Defendant is strong. The text messages proffered by the Government and testified to by Special Agent Ferlazzo speak to the complexity of the plans developed by the conspirators and Ortiz's own heavy involvement in them. Special Agent Ferlazzo testified to text messages Ortiz sent to Solages directing Solages to "delete the messages that could compromise you in case of being captured." Special Agent Ferlazzo testified that Ortiz told Solages to see "with your own eyes" the security at both the Palace and President Moise's residence. The Government proffered Ortiz sent a text message to Rivera with a photo of a drawing

15

on a whiteboard depicting an assault plan of the Palace. The Government proffered that Veintemilla sent Ortiz a document memorializing a loan to Sanon that included $15,000.00 to Solages for ammunition and $250,000.00 for 100 bulletproof vests. Special Agent Ferlazzo testified to Ortiz sending Solages an audio message stating they are "in red numbers" and needed to go forward. Special Agent Ferlazzo testified that Solages sent Ortiz a request of 10 DEA Velcro patches and Ortiz responded "costume party." DEA patches were found at the crime scene after President Moise's assassination. The number of communications between the conspirators testified to and Ortiz's significant entanglement in the conspiracy support a finding that detention is appropriate.

    c. **Defendant's History, Characteristics, and Criminal History**

Ortiz's lack of prior criminal history, drug use, and mental health issues do mitigate the extent to which Ortiz is currently a danger to the community. However, that mitigation is outweighed by the gravity of the offenses he is charged with and his alleged managerial role in those offenses.

Moreover, Ortiz has significant international ties, as he is a Colombian citizen, and his mother and brother both reside in Spain. While Ortiz is in the process of obtaining permanent residency in the United States, Ortiz is currently present in the United States on a nonimmigrant visa. Defendant does have significant ties to the community as his wife is a permanent resident of the United States. However, Ortiz has a high incentive to flee given the weight of the evidence proffered by the Government and the length of his potential sentence if convicted. Accordingly, the Court finds that this factor weighs in favor of detention.

### d. The Nature and Seriousness of the Danger to Any Person or the Community that Would Be Posed by Defendant's Release

The Court finds that the nature and seriousness of the danger weighs in favor of detention given the complexity of the offenses Ortiz allegedly committed outside of the United States without leaving the country. While Ortiz's lack of criminal history does weigh in his favor, this is outweighed by his capacity to allegedly plan for several months the assassination of a sitting foreign president. The evidence proffered by the Government includes deliberate efforts to coordinate, effectuate, and cover up the assassination of a leader of a foreign government for personal financial gain—this proffered evidence reflects a tolerance for and willingness to engage in violence to a degree that supports a finding that Defendant poses a danger to any person and any community. While his criminal history does not demonstrate a pattern of violence, the alleged planning and execution of President Moise's assassination does.

At the hearing, Defendant argued that President Moise was a violent man that frequently arrested his dissenters. It is unclear how any purported violence by the victim would be relevant to evaluating Defendant's dangerousness for the purposes of the pretrial detention hearing. While this assertion could demonstrate why Defendant would be motivated to assassinate President Moise, it does not change that Ortiz and his co-conspirators allegedly decided to assassinate a sitting foreign president for their own financial gain. This decision demonstrates that no condition or combination of conditions will reasonably assure Ortiz's appearance or the safety of any individual or the community.

### e. Conclusion

As described above, the nature and seriousness of the offenses, the weight of the evidence against Defendant, Defendant's history and characteristics, and the risk posed by Defendant's release all weigh in favor of granting the Government's motion for pretrial detention. The factors

17

show that Defendant poses a substantial risk of non-appearance and that he poses a danger to the community. Furthermore, Defendant has not rebutted the presumption that no condition or combination of conditions of release will reasonably assure the appearance of Defendant as required and the safety of the community.

In reaching the conclusion that there are no conditions that will reasonably assure Defendant's appearance, I have considered Defendant's argument that Ortiz has not fled even though he has known of the investigation leading to his arrest in this case for 18 months, has cooperated with law enforcement, and does not have the financial means of his fellow co-conspirators. However, 18 months of not fleeing, cooperating with law enforcement, and lacking financial means do not outweigh the dangerousness shown by the alleged offenses committed and does not overcome his considerable international ties that must be considered when determining if Ortiz poses a risk of flight.

Defendant argued that conditions like 24/7 home detention, an ankle monitor, and the imposition of a bond could reasonably assure his appearance and the safety of the community. While those conditions assist in rebutting the presumption that no conditions can assure Defendant's appearance, given the potential sentence Ortiz faces, the incentive to flee, and his international ties, I find that the proposed conditions would not sufficiently assure his appearance, and thus the Government has proved by a preponderance of the evidence that that no condition or combination of conditions will reasonably assure Defendant's appearance as required. Additionally, the proposed conditions do not rebut the presumption regarding danger to the community, especially given, as the Government proffers, that Ortiz planned President Moise's assassination in Haiti from the United States. The Government has met its burden of showing by

clear and convincing evidence that no combination of conditions would sufficiently assure the safety of the community.

### IV. DISPOSITION

Accordingly, the Court hereby **DIRECTS**:

(a) That Defendant be committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practical, from persons awaiting or serving sentences or being held in custody pending appeal;

(b) That Defendant be afforded reasonable opportunity for private consultation with counsel; and

(c) That, on order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility in which Defendant is confined deliver Defendant to a United States Marshal for the purpose of an appearance in connection with a court proceeding.

**DONE AND ORDERED** in open court in Miami, Florida, this 17th day of February, 2023.

_____
LAUREN F. LOUIS
UNITED STATES MAGISTRATE JUDGE


cc: Counsel of Record
     Pretrial Services (Miami)