**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 22-CR-20104-BECERRA**

**UNITED STATES OF AMERICA**

**v.**

**ARCANGEL PRETEL ORTIZ, et al.,**

　　　　**Defendants.**
_____/

**UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE FIFTH SUPERSEDING INDICTMENT**

The Defendants' Motion to Dismiss Counts 1 through 5 of the Fifth Superseding Indictment (the "Indictment") asks this Court to be the first in the nation to adopt an unprecedented and anti-textual interpretation of 18 U.S.C. § 956(a)(1) (DE 1034).[1] Defendants Arcangel Pretel Ortiz, Antonio Intriago, Walter Veintemilla, Christian Sanon, and James Solages (collectively, the "Defendants") make a remarkable claim: that § 956(a)(1), which criminalizes conspiring to kill or kidnap a person "outside the United States," somehow does not apply to conspiring to kill or kidnap a person—former Haitian President Jovenel Moise (hereinafter "President Moise")—in Haiti. Extraordinary claims require extraordinary support. Yet Defendants fail to cite a single case reading § 956(a)(1) in the way that they propose. They also insist that an "immunity agreement" of dubious validity prevents the Government from prosecuting their attempted coup and successful murder of a foreign leader.

This Court should reject the Motion for numerous reasons. To start, the Indictment

_____

[1] Defendant James Solages filed the Motion to Dismiss on May 2, 2025. Thereafter, Defendants Walter Veintemilla, Antonio Intriago, Arcangel Pretel Ortiz, and Christian Sanon moved to join and adopt the motion.

properly pleads a § 956(a)(1) offense—and gives this Court jurisdiction over the case—because at least one of the conspirators was within the United States, and at least one overt act occurred in the United States, during the conspiracy.   Indeed, the Indictment alleges that many of the Defendants' most critical acts—such as meeting with coconspirators, transporting ballistic vests, and funding their brazen scheme—occurred in the United States.   Thus, the Defendants ignore the Indictment's actual allegations when they mischaracterize this case as "an internal dispute about the presidential succession in Haiti" involving "conduct occurring exclusively in a foreign country" (DE 1034:2, 6).   Also contrary to the Defendants' claims, the charges comport with international law, which has always recognized the right of a country to prosecute criminal activity occurring partially within its own territory—as is true of the alleged conspiracies here.   Finally, this Court should not reach outside the four corners of the Indictment to consider the contents of the purported Haitian immunity agreement when determining the Indictment's viability.   A Fed. R. Crim. P. 12 motion to dismiss does not allow a court to weigh disputed evidence or rule on the insufficiency of evidence; such an inquiry must wait for, at the earliest, a Rule 29 motion for acquittal at trial.   Nor can the Defendants invoke the act-of-state doctrine to compel the Court to accept the supposed immunity agreement.   As noted in *In re Grand Jury Proc. Bank of Nova Scotia*, 740 F.2d 817 (11th Cir. 1984), the act-of-state doctrine does not apply to criminal cases.

## BACKGROUND

On February 14, 2024, a grand jury in the Southern District of Florida returned a nine-count Indictment against the Defendants, four of whom are United States citizens.[2]   In the five counts relevant to the current motion, the Indictment charges the Defendants with Conspiracy to

---

[2] Defendants Intriago, Veintemilla, Sanon, and Solages are United States citizens.  Defendant Ortiz has no lawful status in the United States but resided in the Southern District of Florida at the time of the charged conduct.

Provide Material Support and Resources to Carry Out a Violation of Section 956(a)(1), Resulting in Death, in violation of 18 U.S.C. § 2339A(a) (Count 1); Providing Material Support and Resources to Carry Out a Violation Resulting in Death, in violation of 18 U.S.C.§ 2339A(a) (Count 2); Conspiracy to Kill and Kidnap a Person Outside the United States, in violation of 18 U.S.C. § 956(a)(1) (Count 3); Conspiracy to Commit Offenses Against the United States, in violation of 18 U.S.C. § 371 (Count 4); and Expedition Against Friendly Nation, in violation of 18 U.S.C. § 960 (Count 5).

Significantly, every pertinent charge alleges conduct occurring both in the United States and in Haiti, starting with Count 1: "[From] February of 2021, and continuing through … July 7, 2021, *in the Southern District of Florida* and in a place outside the United States, including Haiti … the defendants … did knowingly combine, conspire, confederate, and agree with each other and other persons … to provide material support and resources" to aid "a conspiracy to kill and kidnap a person outside of the United States" (DE 552:2) (emphasis added).  Counts 2, 3, 4, and 5 all contain similar allegations about the location of those crimes.  *See* (DE 552:3-7).

Count 3, the § 956(a)(1) charge, alleges that the critical agreement occurred both inside and outside the United States, and that at least one coconspirator was within U.S. jurisdiction:

> Beginning in . . . February of 2021, and continuing through . . . July 7, 2021, *in the Southern District of Florida* and in a place outside the United States, including Haiti … the defendants … did knowingly and intentionally combine, conspire, confederate, and agree with each other and other persons … *at least one of whom having been within the jurisdiction of the United States*, to commit at a place outside the United States, acts that would constitute murder and kidnapping if these crimes were committed in the special maritime and territorial jurisdiction of the United States, that is, the murder and kidnapping of the President of Haiti, Jovenel Moise[.]

(DE 552:4) (emphases added).  Count 3 further alleges that "one or more conspirators did commit one or more acts within the jurisdiction of the United States, to effect the purpose and object of the conspiracy" (DE 552:4).

3

Finally, the "Overt Acts" section incorporated into Count 4 alleges specific acts by every Defendant that occurred in the United States. For example, in early April 2021, all five Defendants met with coconspirator Joseph Joel John (a former co-defendant who has pleaded guilty in this case) in the Southern District of Florida (DE 552:5-6). In April 2021, Defendant Veintemilla provided a $175,000 line of credit to support Defendant Sanon; Defendants Intriago and Veintemilla executed that agreement, with Defendant Ortiz signing as a witness (DE 552:6). Several weeks later, in May 2021, Defendant Sanon signed a "Consultant Agreement" with the Counter-Terrorist Unit ("CTU") to provide ballistic vests for his "private military" in Haiti (DE 552:6). Defendants Sanon and Intriago then traveled from the Southern District of Florida to Haiti on a private flight, transporting a small number of ballistic vests to support the illegal expedition (DE 552:6). In June 2021, Defendant Veintemilla paid over $9,000 to fund the travel of "approximately 18 Colombian nationals with military training" to Haiti, and wired another $15,000 to Defendant Solages to "fund the co-conspirators' acquisition of ammunition" (DE 552:6). In late June 2021, Defendant Solages "flew from Haiti to the Southern District of Florida" and delivered the purported Haitian immunity agreement to his coconspirators, Defendants Ortiz, Intriago, and Veintemilla—all of whom were in the United States at the time (DE 552:7). Defendant Solages then returned to Haiti and, on July 7, 2021, participated in President Moise's assassination in Haiti. *See* (DE 552:7). The Indictment thus provides the Defendants ample notice of the charged crimes and plainly identifies substantial conduct that occurred in the United States.

## LEGAL STANDARD

Ordinarily, an indictment will survive a motion to dismiss if it: (1) presents the essential elements of the charged offense, (2) notifies the accused of the charges, and (3) enables the accused to rely upon a judgment under the indictment as a bar against double jeopardy. *United States v.*

4

*Steele*, 178 F.3d 1230, 1233-34 (11th Cir. 1999). Thus, an indictment is generally sufficient if it "set[s] forth the offense in the words of the statute." *Hamling v. United States*, 418 U.S. 87, 117 (1974). The Defendants do not appear to be making this type of challenge to the indictment, nor could they. Counts 1 through 5 notify the Defendants of the charges against them and allege all the essential elements of each statute, tracking the language of the applicable statutes.

A defendant also may seek to dismiss an indictment on the grounds that it "affirmatively allege[s] facts that conclusively negate[] the existence of any offense against the laws of the United States." *United States v. Brown*, 752 F.3d 1344, 1353 (11th Cir. 2014). These types of challenges are quite narrow; they require determining if the indictment's allegations charge "a crime that simply did not exist in the United States Code" or "conduct that undoubtedly fell outside the sweep of the [charging] statute." *Id.* The Defendants are mounting this second type of challenge.

In resolving Rule 12 motions, the Eleventh Circuit has cautioned that "[t]here is no summary judgment procedure in criminal cases." *United States v. Salman*, 378 F.3d 1266, 1268 (11th Cir. 2004). Therefore, a pre-trial review of an indictment must not reach beyond the four corners of the indictment. *United States v. Joyner*, 2009 WL 1286211, at *2 (N.D. Fla. May 6, 2009) ("As long as the language in the four-corners of the indictment sets forth the essential elements of a crime, the indictment will stand."); *Salman*, 378 F.3d at 1268 ("A motion for acquittal under Rule 29 is the proper avenue for contesting the sufficiency of the evidence in criminal cases."). As the *Brown* Court put it, the Defendants must show that the "very allegations in the indictment affirmatively negated that [they] committed the offense[s]" covered by §§ 956(a)(1) and 960. 752 F.3d at 1352.

**ARGUMENT**

I.   <u>The Indictment Alleges the Essential Elements of 18 U.S.C. § 956(a)(1)—the
     Crime of Conspiring to Kill or Kidnap a Person in a Foreign Country—and
     § 956(a)(1) Covers the Conduct Alleged in the Indictment.</u>

   A.   **Section 956(a)(1)'s Plain Language Criminalizes the Precise Conduct Alleged
        in the Indictment.**

According to the Defendants, "Counts 1, 2, and 3 of the indictment fail because 18 U.S.C

§ 956(a)(1) does not criminalize a conspiracy to engage in acts constituting murder or kidnapping

in the territory of a foreign sovereign" (DE 1034:5).[3] Yet § 956(a)(1)'s plain language criminalizes

exactly that.  As its title states, the statute covers "conspiracy to kill, kidnap, maim, or injure

persons … in a foreign country."  18 U.S.C. § 956.  No precedent or canon of interpretation

supports the statutory reading urged by the Defendants.

Section 956(a)(1) covers the following:

> Whoever, within the jurisdiction of the United States, conspires with one or more
> other persons, regardless of where such other person or persons are located, to
> commit at any place outside the United States an act that would constitute the
> offense of murder, kidnapping, or maiming if committed in the special maritime
> and territorial jurisdiction of the United States shall, if any of the conspirators
> commits an act within the jurisdiction of the United States to effect any object of
> the conspiracy, be punished …

18 U.S.C. § 956(a)(1).

To interpret a statute, courts begin with "the language itself," *McNeill v. United States*, 563

U.S. 816, 819 (2011), "giving the words used their ordinary meaning," *Artis v. District of

Columbia*, 583 U.S. 71, 83 (2018) (quotation omitted).  The "inquiry ceases in a statutory

construction case if the statutory language is unambiguous and the statutory scheme is coherent

---

[3] Counts 1, 2, and 3 all rise and fall on the interpretation of § 956(a)(1) because Counts 1 and 2 are
compound offenses, which relate to conspiring to provide material support for, and actually
providing material support for, the § 956(a)(1) conspiracy alleged in Count 3.

and consistent." *Sebelius v. Cloer*, 569 U.S. 369, 380 (2013) (cleaned up).

Here, the statute's language is plain and unambiguous. It criminalizes the following four-element offense: (a) within the jurisdiction of the United States, conspiring with one or more persons (whether located in the United States or outside the country); (b) to commit a murder, kidnapping, or maiming outside the United States; (c) if that act would constitute murder, kidnapping, or maiming had it occurred within the United States' jurisdiction; and (d) committing at least one overt act in furtherance of the conspiracy within the jurisdiction of the United States. None of these four essential elements is difficult to understand or exhibits any ambiguity.  While the participants in the crime must intend for the murder-or-kidnapping object of the conspiracy to occur abroad, the lynchpins of the crime—the participants' illegal agreement and at least one overt act in furtherance of that illegal agreement—must occur within U.S. jurisdiction.

Measured against the statute's plain language, this Indictment states an offense that clearly falls within § 956(a)(1)'s sweep.  Count 3 alleges that "in the Southern District of Florida and in a place outside the United States, including Haiti … the defendants … did knowingly and intentionally combine, conspire, confederate, and agree with each other and other persons" (DE 552:4)—which satisfies element (a) listed above.  It also alleges that "at least one of" the conspirators was "within the jurisdiction of the United States," doubly satisfying that nexus requirement (*id.*).  Next, Count 3 describes the object of the conspiracy: " to commit at a place outside the United States, acts that would constitute murder and kidnapping if these crimes were committed in the … jurisdiction of the United States" (*id.*)—which covers elements (b) and (c). Finally, the Indictment alleges that "one or more conspirators did commit one or more acts within the jurisdiction of the United States, to effect the purpose and object of the conspiracy" (*id.*), which satisfies the final element (d).

Later on, the Indictment elaborates on specific overt acts in furtherance of Count 4, which are many of the same acts that furthered the conspiracy alleged in Count 3, including: (1) all five Defendants met in the Southern District of Florida with a former co-defendant, Joseph Joel John; (2) Defendant Veintemilla provided a $175,000 line of credit to support Defendant Sanon's attempt to usurp power in Haiti, in a contract signed by Defendants Intriago, Veintemilla, and Ortiz; (3) Defendant Sanon signed an agreement for "private military" forces with CTU, the company controlled by Defendants Intriago and Ortiz; (4) at various times, Defendants Sanon, Intriago, and Solages traveled between the Southern District of Florida and Haiti to further the illegal scheme; (5) Defendant Veintemilla paid for the travel of Colombian military contractors to Haiti and for Defendant Solages to buy ammunition in Haiti; (6) Defendants Intriago, Sanon, and former co-defendant Frederick Bergmann shipped ballistic vests from the Southern District of Florida to Haiti; (7) in or around June 28, 2021, Solages flew from Haiti to the Southern District of Florida to deliver a purported Haitian immunity agreement to the U.S.-based conspirators, Defendants Ortiz, Intriago, and Veintemilla; and (8) Solages returned to Haiti and participated in the attack on President Moise's residence on July 7, 2021 (DE 552:5-7).

Thus, not only did the Defendants' agreement occur in (or at least partially in) the Southern District of Florida, but many critical overt acts—including planning, financing, and arming the plot to kill or kidnap Haiti's President—all occurred here as well.  In short, the Indictment's allegations could not have tracked the language of the statute or fit the prohibited conduct any more closely.  Based on the plain text alone, the Court should deny Defendants' Motion to Dismiss.

**B.      The Defendants' Contrary Gloss on § 956(a)(1) Is Absurd on its Face and Finds No Support in Any Canon of Statutory Interpretation.**

Instead of applying the plain language of the statute, the Defendants advance a novel and unprecedented interpretation of § 956(a)(1).  In their view, although the statute describes

8

conspiring to commit murder, kidnapping, or maiming in places "outside the United States," 18 U.S.C. § 956(a)(1), what Congress actually meant to cover was a much narrower realm of conduct that related to places "outside the United States that are *not otherwise within the jurisdiction of a foreign sovereign*, such as offenses on the high seas or otherwise outside the territorial jurisdiction of any state" (DE 1034:9-10).   Although the Defendants gesture at a few canons of statutory interpretation that (they claim) "override[] even plain language in a statute" (DE 1034:7), they misunderstand and misapply those principles here for six related reasons.

*First*, the Defendants ignore the Indictment's actual allegations when they contend that "American criminal statutes [generally] do *not* criminalize conduct occurring exclusively in the jurisdiction of a foreign sovereign" (DE 1034:5).   That legal claim, true or not, has no bearing here.   Count 3 charges a § 956(a)(1) conspiracy where the agreement occurred between at least one U.S.-based conspirator and other persons, and it also alleges that at least one overt act (in fact, many) occurred in the U.S.   *See* (DE 552:4-7).   Thus, the Defendants' challenge appears directed at a very different case than the one that the Government has brought, and their arguments depend on not reading the Indictment or ignoring all of its allegations of U.S.-based activity.

When evaluating Count 3's sufficiency, it is important to remember that "the essence of a conspiracy is an agreement to commit an unlawful act."   *United States v. Jimenez Recio*, 537 U.S. 270, 274 (2003) (quotations omitted).   Conspiracy statutes target the "distinct evil" of agreeing to an unlawful act and treat that agreement as a separate offense from "the commission of the relevant substantive crime."   *Id.* at 274-75 (quotations omitted).   Thus, the Defendants' Motion shines the spotlight in the wrong place, focusing on President Moise's assassination in Haiti, the culmination of their illegal plot.   But the essence of Count 3 was the Defendants' agreement—made in large part in the United States—to kill or kidnap President Moise.   And that crucial act, which occurred

largely within U.S. jurisdiction, months before its bloody and violent culmination on July 7, 2021, "may exist and be punished whether or not the substantive crime ensues." *Id.* at 274; *see also United States v. Elliott*, 266 F. Supp. 318, 323 (S.D.N.Y. 1967) ("[T]he United States has the power to prosecute conspirators for an agreement made within its borders" even if "the substantive offense is without its jurisdiction").

*Second*, the Defendants compound their initial mistake by invoking the *Charming Betsy* canon of statutory construction. *See* (DE 1034:6-9). In simple terms, that canon states that "a statute should be interpreted in compliance with international law." *Samantar v. Yousuf*, 560 U.S. 305, 320 n.14 (2010) (citing *Murray v. Schooner Charming Betsy*, 2 Cranch 64 (1804)). But asserting U.S. jurisdiction over criminal conduct occurring at least partially within the U.S. does not violate any principle of international law. The United States has jurisdiction over criminal conspiracies when part of the conspiracy takes place within the United States. *See Ford v. United States*, 273 U.S. 593, 622 (1927) ("[J]urisdiction exists to try one who is a conspirator, whenever the conspiracy is in whole or in part carried on in the country whose laws are conspired against."). In *United States v. Inco Bank & Trust Corp.*, for instance, the Eleventh Circuit held that "[c]learly, the Government had the power to prosecute" a foreign defendant who joined a partially U.S.-based conspiracy because it "is well settled that the government has the power to prosecute every member of a conspiracy that takes place in United States territory[.]" 845 F.2d 919, 920 (11th Cir. 1988) (citing *Ford* and other authorities).

In fact, the main treatise cited by the Defendants, the Restatement (Third) of Foreign Relations Law, supports the Government's position. In Restatement § 402, which covers the bases for jurisdiction, the very first rule is that "a state has jurisdiction to prescribe law with respect to … conduct that, wholly or in substantial part, takes place within its territory." Restatement (Third)

of Foreign Relations Law § 402 (1987).  Restatement § 403 limits that principle to some extent, cautioning that a state "may not exercise jurisdiction to prescribe law with respect to a person or activity having connections with another state when the exercise of such jurisdiction is unreasonable."  Restatement (Third) of Foreign Relations Law § 403 (1987).  Whether exercising jurisdiction is unreasonable is governed by a nonexclusive list of factors including, among others, "the extent to which the activity takes place within the territory" of the prosecuting state, "the connections, such as nationality, residence, or economic activity, between the regulating state and the person principally responsible for the activity to be regulated," "the character of the activity to be regulated," "the extent to which the regulation is consistent with the traditions of the international system," and "the extent to which another state may have an interest in regulating the activity."  *Id.*  But those factors show why § 956(a)(1)'s exercise of jurisdiction is reasonable. Count 3 charges a conspiracy whose "essence" lies in the illegal agreement, and that agreement occurred "wholly on in substantial part" within U.S. jurisdiction, between U.S. citizens or residents, and involved many overt acts occurring within the U.S.  Thus, no international-law principle bars § 956(a)(1) from criminalizing conspiracies, hatched in the U.S., to commit murders or kidnappings abroad.

*Third,* putting aside the general authorities cited by the Defendants, the Court should not lose sight of the fact that they fail to cite a single court decision holding—or even an academic article that argues—that § 956(a)(1) is limited to acts occurring "outside any sovereign's territorial jurisdiction" (DE 1034:10).  Thus, they have no § 956(a)(1)-specific case law supporting their position.  On the contrary, § 956(a)(1) decisions around the country never hint at this limitation, even though they have affirmed convictions for murders or kidnappings that occurred within foreign countries.  One of those cases involved a murder in Haiti, the same foreign country at issue

11

here. *See United States v. Wharton*, 320 F.3d 526, 537-38 (5th Cir. 2003) (affirming the sufficiency of the evidence supporting a § 956(a)(1) conviction for conspiracy to murder the defendant's wife in Haiti because at least one of the conspirators was within the jurisdiction of the United States when the agreement was made). Another featured similar facts in which U.S.-based conspirators attempted to depose and kill a person who had seized power in Cambodia, and whom the defendant viewed as an illegitimate ruler. *See United States v. Chhun*, 744 F.3d 1110, 1115-18 (9th Cir. 2014).[4] Much like those cases, although President Moïse was killed in Haiti, "at least one of the conspirators was within the jurisdiction of the United States when the agreement was made." *Wharton*, 320 F.3d at 538.

*Fourth*, in a last-ditch effort to support their reading of § 956(a)(1), the Defendants highlight the textual distinction between § 956(a)(1) and § 956(b), the latter of which limits its scope to certain property "situated within a foreign country and belonging to a foreign government" and other public utilities like "railroad[s], canal[s], bridges, [or] airport[s]." 18 U.S.C. § 956. According to the Defendants, the express inclusion of "foreign country" in § 956(b) implies that § 956(a)(1), which lacks the same language, excludes foreign countries' territory. *See* (DE 1034:10-11). But they miss the point of that textual difference and overlook the better, more natural reading of the statute. Subsection 956(a)(1) covers all U.S.-based conspiracies to commit murders or kidnappings "outside the United States," including both foreign countries and high

---

[4] For other examples of § 956(a)(1) prosecutions involving murders or kidnappings in foreign countries, *see United States v. Diaz*, 90 F.4th 335, 342-43 (5th Cir. 2024) (applying § 956(a)(1) to murders that occurred in Mexico because at least one conspirator committed an overt act in the United States), *United States v. Fernandez*, 559 F.3d 303, 325-28 (5th Cir. 2009) (upholding § 956(a)(1) conviction for murder in Mexico because part of the conspiracy took place in Texas), and *United States v. Sattar*, 395 F. Supp. 2d 79, 98-99 (S.D.N.Y. 2005) (rejecting the defense's argument that the government failed to prove "which country or countries the victims would be killed" in, because "the Government was not required to allege or prove … the specific location outside the United States where the contemplated killing is to occur").

seas.  Subsection 956(b), by contrast, is limited to conspiracies that target property "situated within a foreign country and belonging to a foreign government."  In other words, § 956(a)(1) sweeps *more broadly* in scope than § 956(b).  The "foreign country and belonging to a foreign government" language in § 956(b) *narrows* that subsection to public or quasi-public property belonging to foreign governments.  Nor would it make any sense to include the same phrase in § 956(a)(1), particularly since no person can meaningfully be said to "belong[] to a foreign government."  Thus, the Defendants get the answer backward: while the textual distinction between the two provisions is meaningful, Congress intended the broader language of § 956(a)(1) to capture a wider scope of conduct than the narrower, foreign-government-property-focused text of § 956(b).

*Fifth*, § 956(a)(1)'s title and legislative history disprove the Defendants' claim that the statute is limited to regions outside of any sovereign's control.  Although the Court need not consult either of these interpretive tools of last resort in light of the statute's clear text, these sources of guidance bolster the Government's interpretation.  Section 956's title is "Conspiracy to kill, kidnap, maim, or injure persons or damage property in a foreign country."  That title would be extremely misleading, to say the least, if § 956(a)(1) failed to cover conspiracies to kill, kidnap, or maim people in foreign countries.  *See Dubin v. United States*, 599 U.S. 110, 120-21 (2023) ("the title of a statute [is] available for the resolution of a doubt about the meaning of a statute," as long as it is consistent with the statutory text) (quotations omitted).

The legislative history tells the same story:

> The new section fills a void in the law that exists. Currently, subsection 956(a) only prohibits a conspiracy in the United States to commit certain types of property crimes in a foreign country with which the United States is at peace. It does not cover conspiracy to commit crimes against the person. Subsection 102(a) thus expands on the current section 956 so that *new subsection 956(a) covers*

> *conspiracy to commit one of the three listed serious crimes against*
> *any person in a foreign country* or in any place outside of the
> jurisdiction of the United States, such as on the high seas.

141 Cong. Rec. S6202-03, S6204, 1995 WL 261206 (emphasis added).  Later, a section-by-section

analysis of the bill explains that § 956(a)(1) "would apply, for example, to two individuals who

consummated an agreement to kill a person in a foreign country where only one of the conspirators

was in the United States," as long as "at least one of the overt acts was undertaken by one co-

conspirator while in the United States."  *Id.*

    *Sixth*, and finally, Defendants insist (again contrary to the plain text) that Section 956(a)(1)

is solely an "anti-terrorism measure" and not intended to "displace foreign sovereigns' authority

over ordinary crimes like murder or kidnapping" (DE 1034:11).  Yet the assassination of a

president, wherever it may take place, is far from ordinary and would fall within the umbrella of

"anti-terrorism" enforcement.  In any event, the Ninth Circuit in *Chhun* rejected this very defense

argument.  *See* 744 F.3d 1110.  In *Chhun*, the defendant argued that because he was not involved

in terrorist activities, § 956(a)(1) could not apply to his attempt to kill a Cambodian official.  *Id.*

at 1116.  The *Chhun* Court held, however, that Section 956(a) was unambiguous and "does not

limit its application to 'terrorist' acts, or to acts that affect United States citizens or interests."  *Id.*

Indeed, Congress intended to "prevent people within the borders of the United States from plotting

to commit murder in a foreign country."  *Id.*

    In sum, the Defendants' anti-textual and counterintuitive interpretation of § 956(a)(1) has

no support.  This Court should apply the statute's plain meaning, which covers the fact pattern—

a U.S.-based conspiracy to kill a foreign country's leader in his home country—alleged in Counts

1 through 3.[5]

--------

[5] The Government does not understand the Defendants to be claiming that the § 965(a)(1) has no

## II. **This Court Should Not Consider the Purported Haitian Immunity Agreement in Evaluating the Motion To Dismiss Because Doing So Would Require Weighing Evidence and Determining Disputed Facts Beyond the Four Corners of the Indictment.**

The Defendants' second argument for dismissal—based on a purported request for international assistance and immunity agreement—asks this Court to wade into hotly contested factual disputes between the parties and, in essence, to make defense-favorable factual findings that dispose of the Indictment's charges. But the Federal Criminal Rules contain no mechanism for the Court to prejudge the facts and decide matters that belong to the jury. Thus, this Court should reject the Defendants' invitation to dismiss Counts 1 through 5.

As noted above, "[t]here is no summary judgment procedure in criminal cases." *Salman*, 378 F.3d at 1268. Yet Defendants claim, as a factual matter, that their actions were "authorized or immunized by foreign officials in the jurisdiction where the conduct occur[red]" (DE 1034:13).

To grant the Defendants' Motion, this Court would need to accept as true their version of the facts—which the Government vehemently contests. To prove their claims, the Defendants would have to establish that: 1) the judge did in fact sign the request for assistance and immunity agreement; 2) the judge acted within the color of authority; 3) the Haitian prosecutor signed the

---

extraterritorial applications. *See* (DE 1034:9) (distinguishing their "extrajurisdictionality" argument from the presumption against extraterritoriality). After all, their own reading also applies § 965(a)(1) to conduct outside the United States, just in a different way. To the extent they are making an extraterritoriality argument, however, it would be meritless. The presumption against extraterritoriality provides that, "[a]bsent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." *RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325, 335 (2016). Even so, a statute will apply "extraterritorially if it demonstrates on its face that extraterritorial application is Congress's express intent." *United States v. Noel*, 893 F.3d 1294, 1297 (11th Cir. 2018); *see also RJR Nabisco v. Eur. Cmty.*, 579 U.S. at 335 (a statute applies extraterritorially when "Congress has affirmatively and unmistakably instructed that the statute will do so"). Because § 956(a)(1) expressly covers conspiracies whose ultimate object is murder, kidnapping, or maiming at "any place outside the United States," 18 U.S.C. § 956(a)(1), that plain statutory text overcomes the ordinary presumption against extraterritoriality.

relevant documents; 4) those documents somehow authorized the assassination of President Moise; and 5) those documents, to the extent that they could be construed as a Haitian arrest warrant, somehow could be legally executed by Colombian private military contractors fulfilling a private contract with CTU and the Defendants, rather than by Haitian law enforcement or other Haitian government personnel.  At trial, the Government will present evidence to show that none of those factual assertions is true.  In fact, some of these documents were prepared by the Defendants themselves in an effort to lend a veneer of legitimacy to their attempted coup.  But now is not the time or the place to delve into these thorny factual disputes; the Court certainly should not step into the role of the jury and engage in this fact-intensive inquiry.  The Defendants are free to reassert these arguments in a Rule 29 motion for acquittal at trial.  *See Salman*, 378 F.3d at 1268.

Although the fact-intensive nature of these claims should be enough, standing alone, to deny the Motion, the Defendants' arguments also suffer from two other serious defects.

*First*, the Defendants' factual account rests in large part on hearsay evidence that would not be admissible at trial, much less material that a court could consider in the motion-to-dismiss posture.  Rather than quoting the language of the Indictment, which contains several significant allegations of U.S.-based activity that the Defendants assiduously ignore, they patch together their narrative largely out of news articles.  *See* (DE 1034:2-5).  Yet when used "to establish the truth of their contents," news "articles are … inadmissible hearsay."  *United States v. Baker*, 432 F.3d 1189, 1211 & n.23 (11th Cir. 2005), *abrogated on other grounds by Davis v. Washington*, 547 U.S. 813 (2006).

Nor should the Court take "judicial notice" of the contested immunity agreement as if it were an official judicial or government record submitted by a foreign nation, as the Defendants urge.  The Defendants claim, citing *United States v. McPhee*, 336 F.3d 1269 (11th Cir. 2003), that

courts may take notice of foreign judicial documents.  But that case bears no resemblance to this one.  In *McPhee*, the district court took judicial notice of an officially promulgated and publicly available statute of the Bahamas.  *See id.* at 1276.  Here, in stark contrast, the Defendants are demanding that this Court accept as an official legal order a document of murky provenance and even more dubious validity, one which the government of Haiti has never endorsed or publicized as an official act of that nation.[6]  This is a far cry from taking judicial notice of a publicly available Haitian statute.  Nor can the Defendants' citation to *Makro Cap. of Am., Inc. v. UBS AG*, 436 F. Supp. 2d 1342, 1350 (S.D. Fla. 2006), help them.  *Makro* was a civil case applying Fed. R. Crim. P. 12(b)(1), governing dismissal for lack of jurisdiction, which operates quite differently than Fed. R. Crim. P. 12.  *See* 436 F. Supp. 2d at 1350 ("[W]hen a party presents a factual attack to a court's jurisdiction, a trial court is free to weigh the evidence," and may also "take judicial notice of the public record," including court filings).  Under the governing criminal rule, in contrast, "a court ruling on a motion to dismiss may not look beyond the four corners of the indictment, nor may it properly dismiss an indictment for insufficient evidence."  *United States v. Baxter*, 579 F. App'x 703, 706 (11th Cir. 2014) (citing *Salman*).

 *Second*, in an attempt to sidestep these factual disputes, the Defendants invoke the act-of-state doctrine and claim that the Court must accept the purported immunity agreement's validity.  *See* (DE 1034:18-21).  But the Defendants fail to note that, as binding Eleventh Circuit precedent establishes, the act-of-state doctrine is "completely inapplicable in the investigatory or criminal context."  *In re Grand Jury Proc. Bank of Nova Scotia*, 740 F.2d 817, 831 (11th Cir. 1984).  The doctrine "aim[s] at preventing judicial interference with the conduct of foreign relations by

---

[6] Indeed, as the Haitian government's prosecution of other individuals for the same events alleged here would tend to suggest, the Haitian government clearly does not view the assassination of President Moise and the attempted coup to be official acts authorized under Haitian law.

questioning the validity of the acts of foreign sovereigns in the context of a *civil suit*." *Id.* (emphasis added). Indeed, in the primary authority governing this doctrine, the Supreme Court, "rather than laying down or reaffirming an inflexible and all-encompassing rule," held "that the (Judicial Branch) will not examine *the validity of a taking of property* within its own territory by a foreign sovereign government, extant and recognized by this country at the time of suit, in the absence of a treaty or other unambiguous agreement." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 428 (1964) (emphasis added). Once again, the Defendants are asking this Court to do something novel and unprecedented; no court has ever applied the act-of-state doctrine in the criminal context, much less to bar charges in an Indictment based on a purported foreign immunity agreement.

The doctrine's basic logic does not apply when the federal government is one of the litigating parties: "the major underpinning that justifies invoking the doctrine is absent .... The act of state doctrine serves to caution a court to defer to the executive branch when it appears its decision will embarrass or hinder the executive in the realm of foreign relations." *In re Grand Jury Subpoena dated Aug. 9, 2000*, 218 F. Supp. 2d 544, 557 (S.D.N.Y. 2002) (quotations omitted). Unlike a civil case between private litigants that potentially could interfere with U.S. foreign relations, this case is a criminal prosecution brought by the same Executive Branch that the act-of-state doctrine is designed to protect. *See id.* ("To the extent that the investigation … might embarrass the executive branch, or hinder its conduct of foreign relations … it is not for this Court to prevent it.").[7]

In the current procedural posture, the Court should reject the Defendants' fact-intensive

---

[7] It should be unsurprising that the "act of state doctrine has never been applied in a criminal prosecution[.]" Brandon L. Garrett, "Globalized Corporate Prosecutions," 97 Va. L. Rev. 1775, 1854 (2011).

arguments, which they are free to present at trial—the proper forum for resolving factual disputes.

### III.     <u>The Rule of Lenity Does Not Apply Here.</u>

As a last resort, the Defendants invoke the rule of lenity (DE 1034:21-22).  But the rule of lenity applies only if, "after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute such that the Court must simply guess as to what Congress intended." *Maracich v. Spears*, 570 U.S. 48, 76 (2013) (quotations omitted). No grievous ambiguity exists here; the plain text of the statute encompasses the factual allegations made in the Indictment, and the legislative history confirms that § 956(a)(1) covers conspiracies to kill or kidnap people in foreign countries.

[Space Intentionally Left Blank]

## CONCLUSION

The Defendants' Motion to Dismiss the Indictment should be denied because (1) the Indictment tracks the statute and notes the Southern District of Florida as the location of the conspiracy and at least one overt act; (2) the charged statutes apply extraterritorially to conduct that occurred in foreign nations, such as Haiti; and (3) review of the purported Haitian immunity agreement is premature.

Respectfully submitted,

HAYDEN P. O'BYRNE
United States Attorney

SUE J. BAI
Supervisory Official for the National
Security Division

By:   */s Sean T. McLaughlin*
Sean T. McLaughlin
Assistant United States Attorney
Court ID No. A5501121
11200 NW 20th Street, Suite 101
Miami, FL 33172
(305) 715-7642/7654
Sean.McLaughlin@usdoj.gov

*/s Jason Wu*
Jason Wu
Assistant United States Attorney
ID No. A5502299
99 NE 4th Street
Miami, FL 33132
(305) 961-9226
Jason.Wu@usdoj.gov

*/s Altanese Phenelus*
Altanese Phenelus
Assistant United States Attorney
FL Bar No. 112693
99 N.E. 4th Street
Miami, FL 33132
(305) 961-9375
altanese.phenelus@usdoj.gov

*/s Andrew Briggs*
Andrew Briggs
Trial Attorney
Court ID No. A5503251
National Security Division – Department of Justice
950 Pennsylvania Avenue
Washington, DC 20530
(202) 514-7739
Andrew.Briggs2@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on May 16, 2025, I electronically filed the foregoing document

with the Clerk of the Court using CM/ECF.

<u>/s/ *Altanese Phenelus*</u>
Altanese Phenelus
Assistant United States Attorney